549 F.2d 1029
 1977-1 Trade Cases 61,362
 IMPERIAL POINT COLONNADES CONDOMINIUM, INC., a Florida
non-profit Corporation,
in its own interest and behalf of its members, Plaintiffs,
Clayton P. Thompson, William M. Wyant, and Virginia Wyant,
his wife, Individually and in behalf of all others similarly
situated, Plaintiffs- Appellants,
v.
Harry T. MANGURIAN, Jr., and Dorothy Mangurian, his wife,
and Drexel Properties, Inc., a Florida
Corporation, Defendants-Appellees.
 No. 76-1657.
 United States Court of Appeals,
Fifth Circuit.
 April 4, 1977.
Rehearing and Rehearing En Banc Denied April 28, 1977.
 
 Jeffrey E. Streitfeld, Alan S. Becker, Becker & Poliakoff, P.A., Miami Beach, Fla., for plaintiffs-appellants.
 Brian C. Deuschle, Donald C. Hain, Ft. Lauderdale, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before MORGAN and GEE, Circuit Judges, and HUNTER,* District Judge.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 In this case we must decide a question concerning when a cause of action accrues under the four year statute of limitations for private treble-damage antitrust suits, Clayton Act § 4B, 15 U.S.C. § 15b. Plaintiffs purchased new condominiums from one of the defendants. As a condition of the purchase, they were required to enter a 99 year lease of nearby recreational facilities with the other defendant, who is president and sole stockholder of the first defendant. Plaintiffs allege that this requirement constitutes an unlawful tying agreement and that the defendants have conspired together to restrain interstate commerce by means of it.
 
 
 2
 The district court granted summary judgment for defendants on the ground that plaintiffs' suit, filed more than four years after they purchased the condominiums and joined the lease, was barred by the statute of limitations. That court held that plaintiffs' only cause of action accrued when they purchased the condominiums and joined the lease, rejecting plaintiffs' argument that new causes of action, not barred, accrued when the defendants committed acts with respect to the lease within the limitations period. For the reasons stated in this opinion, we reverse and remand. We do not, of course, pass on any of the other issues that remain to be resolved below.[1]
 
 
 3
 I. FACTS.
 
 
 4
 Defendant Harry T. Mangurian, Jr. is and, at all times material to this action, has been president, director, and sole stockholder of a Florida corporation known as Drexel Properties, Inc. Drexel Properties, the other defendant, is the developer and was the owner of a 23 building, 552 unit residential condominium project located in Florida and called Imperial Point Colonnades Condominium.
 
 
 5
 Mangurian also is the owner of land adjacent to Imperial Point Colonnades upon which recreational facilities have been built. Mangurian leased the land and its facilities to Drexel Properties on February 1, 1969 for a term of 99 years.[2] The lease provides that on April 1, 1972, and at the end of every three years thereafter, the annual rent shall be adjusted with reference to the Department of Labor's Consumer Price Index in such a way that the rent will remain constant in real purchasing power. Record Vol. I at 9-10.
 
 
 6
 When a person bought a condominium in Imperial Point Colonnades from Drexel Properties, the contract of sale provided that the purchase was subject to the terms of the Declaration of Condominium by which Drexel Properties had submitted the land to the condominium form of ownership.[3] This Declaration, in turn, contains a number of provisions relating to the recreational lease. It requires each unit purchaser, as a condition precedent to ownership, to accept assignment from Drexel Properties of a 1/552 undivided interest in the lease and to assume an obligation to Mangurian for a like proportion of the rent. It also requires each unit purchaser to pledge his unit to Mangurian as security for fulfillment of the obligation under the lease.[4] Finally, it requires, as a condition to any subsequent transfer of ownership of the condominium units, that the transferee assume the transferor's obligation under the lease.
 
 
 7
 On January 4, 1969 plaintiffs William M. Wyant and Virginia Wyant (husband and wife) signed an agreement with Drexel Properties to purchase a condominium unit in Imperial Point Colonnades. On May 28 of that year the Wyants accepted assignment of a 1/552 undivided interest in the recreational lease and executed a pledge of their unit as security for their obligations under the lease, and Drexel Properties transferred title to the unit to them. On December 6, 1969 plaintiff Clayton P. Thompson signed a similar purchase agreement with Drexel Properties, and on July 28, 1970 he accepted assignment of his portion of the lease, executed the required pledge, and received title to a unit.
 
 
 8
 On July 15, 1975 Drexel Properties, as agent for the lessor, sent unit owners a letter informing them that the lessor had "elected" to increase the rent on the recreational lease pursuant to the cost-of-living escalator clause. Record Vol. III at 425-28.[5] The quarterly rent due from each unit owner, which was $148.50 at the inception of the lease and which apparently had been increased to $171.86 sometime after January 1, 1973, now was increased to $216.06, retroactive to April 1, 1975. The letter also stated that the lessor did "not believe that recent legislation abrogating the enforcement of cost of living clauses in leases is valid to deprive persons of vested contractual rights."[6] Finally, the letter warned that those unit owners who previously had reduced their quarterly rental payments from $171.86 back to $148.50 were considered to be in "default of their contractual obligations," and it requested that deficiencies be paid "forthwith."[7]
 
 
 9
 Meanwhile, on January 8, 1975 Thompson and the Wyants, who had continued to pay the rent demanded, filed suit in federal district court against Mangurian and Drexel Properties.[8] Count I of the complaint, after outlining the purchase and lease arrangements described above, alleged that the requirement that purchasers become parties to the lease constituted a tying agreement unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1,[9] and Section 3 of the Clayton Act, 15 U.S.C. § 14.[10] It also alleged that defendants, through use of the tying agreement and enforcement of the lease, had conspired and were conspiring in retraint of interstate commerce in violation of Section 1 of the Sherman Act. Plaintiffs alleged that they were damaged by being required to pay rent on the lease whether they used the recreational facilities or not, by being prohibited from transferring ownership of their units free from the lease, and by being precluded from contracting with other concerns for recreational facilities. The complaint sought treble damages, costs, and attorneys fees under 15 U.S.C. § 15, injunctive relief under 15 U.S.C. § 26, and a declaration that the lease assignments were illegal and void.[11]
 
 
 10
 Defendants pleaded the statute of limitations as a bar to the prayer for damages and laches as a bar to the prayer for equitable relief. Both parties submitted documents, answers to interrogatories, and other discovery materials. The district court then granted defendants' motion for summary judgment on the ground that the statute of limitations barred plaintiffs' suit for damages. That court did not discuss whether laches barred the request for equitable relief. Imperial Point Colonnades Condominium, Inc. v. Mangurian, 407 F.Supp. 870 (S.D.Fla.1976). Plaintiffs appeal.
 
 
 11
 II. GENERAL PRINCIPLES.
 
 
 12
 Section 4B of the Clayton Act, 15 U.S.C. § 15b, which Congress added effective January 7, 1956, places the following limitation on private treble-damage suits under 15 U.S.C. § 15:[12]
 
 
 13
 Any action to enforce any cause of action under (section 15) of this title shall be forever barred unless commenced within four years after the cause of action accrued.
 
 
 14
 Much confusion has surrounded the question, critical to resolution of this case, of when a plaintiff's antitrust cause of action should be considered to have "accrued."[13] The leading case on this issue is Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), where the Supreme Court summarized its understanding of when a cause of action accrues:
 
 
 15
 The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' 15 U.S.C. 15b, plus any additional number of years during which the statute of limitations was tolled. Generally, a cause of action accrues and the statute begins to run when the defendant commits an act that injures a plaintiff's business. (cites) This much is plain from the treble-damage statute itself. 15 U.S.C. § 15.
 
 
 16
 401 U.S. at 338, 91 S.Ct. at 806. The Court went on to explain how this rule operates where a plaintiff alleges that he has been injured by a conspiracy to violate the antitrust statutes, id.:
 
 
 17
 In the context of a continuing conspiracy to violate the antitrust laws, . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.[14]
 
 
 18
 Under Zenith, where defendants are alleged to have committed acts injurious to a plaintiff pursuant to an unlawful conspiracy, and where defendants committed some such acts more than four years before plaintiff commenced suit, and other such acts less than four years before plaintiff commenced suit, the plaintiff is allowed to recover damages resulting only from those acts committed less than four years before commencement of his suit. This much is clear from our own leading case on the subject, Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117 (5th Cir. 1975), where we dealt with an alleged conspiracy among the defendants to refuse to sell certain articles to plaintiff. In that case it was undisputed that defendants had stopped supplying plaintiff with these articles in 1961. Plaintiff filed its antitrust suit in 1969, and defendants argued successfully to the district court that recovery should be barred because more than four years had elapsed between the cutoff of supplies to plaintiff and the commencement of suit.
 
 
 19
 Relying heavily on Zenith, we reversed and remanded summary judgment for defendants. We held that plaintiff would be entitled to maintain the suit if, on remand, it could show that "there had been a specific act or word of refusal (by defendants to deal with plaintiff) during the limitations period." 517 F.2d at 129. This was so because such a reiteration of defendants' refusal to deal would have constituted an "act" within the meaning of Zenith and because "each injurious act of a continuing conspiracy gives rise to an antitrust cause of action." Id. at 127; see also Braun v. Berenson, 432 F.2d 538 (5th Cir. 1970).
 
 
 20
 In the course of the Poster Exchange opinion we were careful to sound two caveats. First, we distinguished cases where all the damage complained of by plaintiff necessarily resulted from an initial, pre-limitations act:
 
 
 21
 Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.
 
 
 22
 Id. at 126-27. Poster Exchange itself was not such a case, though, because defendants could have quit causing the injury at any time by agreeing to deal with plaintiff, id. at 127:
 
 
 23
 (H)ere, where the action complained of was the exclusion of (plaintiff) from any participation in the . . . industry, such action, while perhaps unequivocal, was not of necessity permanent . . .
 
 
 24
 Our second caveat was a reminder that a cause of action will not lie for damages that occur within the four years preceding suit, if those damages result solely from acts committed by the defendant outside the four-year period, id. at 128:
 
 
 25
 (C)ontinuing antitrust conduct resulting in a continued invasion of a plaintiff's rights may give rise to continually accruing rights of action. It remains clear nonetheless that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.[15]
 
 
 26
 Read together, then, our two caveats amount to a restatement of the basic rule that a cause of action accrues each time a defendant commits an act that injures plaintiff. The first caveat emphasizes that where all the damages complained of necessarily result from a pre-limitations act by defendant, no new cause of action accrues for any subsequent acts committed by defendant within the limitations period because those acts do not injure plaintiff. The second caveat emphasizes that where a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitation period, no new cause of action accrues for the damages occurring within the limitations period because no act committed by the defendant within that period caused them.
 
 
 27
 III. APPLICATION TO THIS CASE.
 
 
 28
 With these principles in mind, we turn to the parties' contentions. Plaintiffs concede that they bought their condominium units and became parties to the recreational lease more than four years before commencing suit. They argue, though, that Mangurian's quarterly collection of rent and his increases in the amount of the rent constituted acts that injured plaintiffs and that were committed within four years of commencement of their suit; and that, under Zenith and Poster Exchange, a new cause of action accrued upon the commission of each of these acts.
 
 
 29
 Defendants argue, and the district court held, that any cause of action plaintiffs might possess accrued when plaintiffs bought their units and became parties to the lease. Defendants' argument, based on the two caveats of Poster Exchange, is that the sale of the condominium units and assignments of the lease were the only "acts" committed by either defendant; and that even if the other activities of defendants relied on by plaintiffs were "acts," all the damage to plaintiffs necessarily resulted from the initial, pre-limitations act by Drexel Properties of selling the condominium unit and assigning the lease.[16]
 
 
 30
 In order to evaluate these competing contentions properly, we find it necessary first to study a series of cases, many of which the parties call to our attention, that apply the principles discussed in Zenith and Poster Exchange to fact situations more like those here. Then we return to the instant case and apply what we have learned, noting that this case has one twist absent from the others. Our conclusion is that plaintiffs are correct in their contentions.
 
 
 31
 A. Similar Cases. It is apparent that the parties' contentions here present somewhat different problems from those envisioned in Zenith and Poster Exchange, although the principles underlying decision must remain the same. We therefore turn to a series of cases more like this one, where plaintiff and a defendant entered a contract in the pre-limitations period that continued in force into the limitations period. Cases of this kind can be divided into two categories. First, plaintiff may allege that the contract itself violates the antitrust laws, i. e., is a tying, price-fixing, exclusive dealing, or similar contract. In such cases, plaintiffs (like plaintiffs here) generally argue that a new cause of action accrues to them each time the defendant enforces or collects benefits under the contract within the limitations period. The theory is that each such act committed by the defendant under the authority of the unlawful contract is itself an unlawful act, causing injury to plaintiff; hence, under the general rule of Zenith, a new cause of action accrues upon the commission of each such act.
 
 
 32
 Second, plaintiff may allege that his contract with defendant, whether lawful or unlawful in itself, is being used by a group of defendants as an instrument of an unlawful conspiracy to restrain trade. Again, plaintiffs (like plaintiffs here) generally argue that a new cause of action accrues to them each time the defendant enforces or collects benefits under the contract within the limitations period. The theory is that each time the contracting defendant does so, he commits an overt act pursuant to the conspiracy and injurious to plaintiff; hence, under conspiracy cases like Zenith and Poster Exchange, a new cause of action accrues upon the commission of each such act.
 
 
 33
 In both kinds of cases, defendants (like defendants here) generally make one of two arguments, corresponding to our two caveats in Poster Exchange. First, they argue that their enforcement of or collection of benefits under the contract are not "acts" at all, so that any injury to plaintiff occurring within the limitations period could only have been caused by defendant's pre-limitations act of executing the contract. Second, they may argue that even if their enforcement or collection of benefits are acts, all the injury to plaintiffs necessarily resulted from defendant's pre-limitations act of executing the contract. Under either of these arguments, plaintiff's only cause of action would accrue when the contract was executed, so that plaintiff would be barred from complaining of defendant's enforcement or collection of benefits under it four years after it was executed.
 
 
 34
 Although courts' reactions to these kinds of cases have been mixed, we find that the majority, particularly in more recent cases, favors the view that the plaintiff's cause of action in both kinds of cases continues to accrue for as long as the defendant takes advantage of the contract in question. Analyzing the cases in terms drawn from cases like Zenith and Poster Exchange, these courts feel that the defendant could quit causing the injury of which the plaintiff complains at any time, simply by not enforcing or collecting benefits under the contract in question; hence, in Poster Exchange's words, the violation is not "final at its impact . . . or . . . by its nature permanent at initiation without further acts." There also seems to be a prevalent opinion that it does not lie well in the mouth of a defendant to argue that he is immunized from suit for his recent acts simply because a pre-limitations contract, alleged to be unlawful in itself or the product of an unlawful conspiracy, purports to authorize the commission of such acts. To these courts, the important fact seems to be that the defendant must continue to commit these acts in order to continue reaping the fruits of the allegedly unlawful contract or conspiracy.
 
 
 35
 The case most often relied upon by such courts was decided by the Supreme Court three years before Zenith. In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) plaintiff, a shoe manufacturer, sued defendant, a manufacturer of shoe machinery, in 1955, charging that defendant had monopolized the shoe machinery industry through its policy of leasing and refusing to sell shoe machinery to plaintiff and others. Plaintiff sought to recover three times the difference between the amount it paid defendant in rental for the shoe machinery in the period during which suit was not barred by the statute of limitations, and the amount it would have paid if defendant had been willing to sell the machinery during that period. All sides conceded that defendant's lease-only policy was instituted in 1912, and the then-applicable Pennsylvania statute of limitations barred actions that accrued before July 1, 1939.
 
 
 36
 In the district court the defendant argued that plaintiff was not entitled to recover any damages based on leases entered before July 1, 1939, because the cause of action as to those leases accrued when they were executed. The district court, relying primarily on Cardinal Films, Inc. v. Republic Pictures Corp., 148 F.Supp. 156 (S.D.N.Y.1957), summarized at note 21 infra, and rejecting Muskin Shoe Co. v. United Shoe Machinery Corp., 167 F.Supp. 106 (D.Md.1958), discussed infra, held that plaintiff was entitled to recover damages for payments made to defendant after July 1, 1939 under leases entered before that date. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 245 F.Supp. 258, 294-97 (M.D.Pa.1965).
 
 
 37
 In the court of appeals defendant changed its statute of limitations argument, asserting that plaintiff's whole cause of action accrued in 1912, when defendant first refused to sell its machinery. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776, 793-95 (3d Cir. 1967) (supplemental opinion). The court of appeals declined to follow cases cited by defendant, see id. at 794 n. 2, that held the cause of action for a refusal to deal accrues upon the first such refusal, and not upon subsequent refusals. The court first noted that plaintiff sought to recover only those damages inflicted after 1939, and it adopted the district court's method of calculating these damages:
 
 
 38
 (T)he specific collection of rentals every month within the statutory period provides a concrete standard for the measurement of the damages which occurred here within the statutory period by comparing the rentals with the reasonable sales value of the machinery.
 
 
 39
 Id. at 794. The court then pointed to defendant's collection of rent within the limitations period on leases executed outside the period as an act, in addition to the refusals to deal, injurious to plaintiff, id. (emphasis added):
 
 
 40
 Finally, in the (cases relied on by defendant) the continuing conduct was that of a mere reassertion of the refusal to deal. Here, however, (defendant) went beyond a mere continuation of the refusal to sell; it collected rentals on leases and entered into new leases when old machinery was no longer in working condition and required replacement.
 
 
 41
 The defendant renewed its statute of limitations arguments in its appeal to the Supreme Court, where they received short shrift:
 
 
 42
 (Defendant) has also advanced the argument that because the earliest impact on (plaintiff) of (defendant's) lease only policy occurred in 1912, (plaintiff's) cause of action arose during that year and is now barred by the applicable Pennsylvania statute of limitations. The Court of Appeals correctly rejected (defendant's) argument in its supplemental opinion. We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Cf. Emich Motors Corp. v. General Motors Corp., 229 F.2d 714 (CA 7th Cir. 1956), upon which (defendant) relies. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on (plaintiff). Although (plaintiff) could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.
 
 
 43
 392 U.S. at 502, n. 15, 88 S.Ct. at 2236. These comments can be read, we think, as an endorsement of the district court's and court of appeal's positions that the defendant's continued collection of rent within the limitation period on leases executed in the pre-limitations period marked the accrual of successive causes of action.
 
 
 44
 At any rate, this is how the Seventh and Ninth Circuits have read Hanover Shoe. In Baker v. F&F Investment, 420 F.2d 1191 (7th Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970), aff'g Contract Buyers League v. F& F Investment, 300 F.Supp. 210 (N.D.Ill.1969), plaintiffs, the class of blacks who were buying homes from defendants on installment sales contracts, sued charging that defendants had conspired to exact more onerous contractual terms from plaintiffs than they exacted from white buyers. Among other things, plaintiffs alleged this constituted a conspiracy to fix prices in violation of Section 1 of the Sherman Act. 300 F.Supp. at 216-17.
 
 
 45
 Defendants' motion to dismiss in the district court was on statute of limitations grounds quite similar to those asserted by defendants here:
 
 
 46
 Defendants . . . insist that there can be no relief with respect to any contract that was executed earlier than the limitations period, even if payments were made at a later time still within the applicable period, are still being made, or are required under the contracts to be made for many years to come.
 
 
 47
 Id. at 219. The district court denied the motion, holding that plaintiffs' cause of action did not stop accruing so long as defendants collected payments under the installment contracts and sought to enforce those contracts. Id. at 218-21.[17] The Seventh Circuit, citing note 15 of Hanover Shoe, affirmed this holding and stated:
 
 
 48
 Plaintiffs have alleged wrongs committed by defendants which continue during the entire lives of the individual purchase contracts. They have alleged a conspiracy among defendants, the object of which was the establishment of a continuing relationship with individual plaintiffs. That relationship, by the same token, constituted a prolonged and continuing invasion of the rights of purchasers. . . . Because of the continuing nature of the overt acts alleged, the statutes of limitations do not commence to run when the contracts were executed but when they terminate. Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231.
 
 
 49
 420 F.2d at 1200.[18] Thus it is plain that, in the Seventh Circuit's opinion, a defendant's receipt of payments from a plaintiff under a contract that embodies illegally fixed prices, and its attempts to enforce the contract, constitute the commission of acts injurious to the plaintiff; and that a new antitrust cause of action accrues from the commission of each such act.[19] Significantly, we cited this portion of Baker with approval in Poster Exchange as an example of continuing conduct for which antitrust causes of action continue to accrue. 517 F.2d at 127.
 
 
 50
 In similar fashion, the Ninth Circuit relied on note 15 of Hanover Shoe in Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975), rev'g and remanding on other grounds, 365 F.Supp. 235 (N.D.Cal.1972). In Twin City a predecessor of Finley, the owner of the Oakland athletics baseball team, entered a concession franchise contract in 1950 with the predecessor of Sportservice. The contract, which was amended in 1954 to provide for a 33 year term, called for the franchise to follow the team and for Sportservice's predecessor to extend credit to Finley's predecessor. In 1967 Finley moved the team to Oakland and in 1968 another concessionaire took over operations at the team's home park.
 
 
 51
 Sportservice sued Finley for breach of the 1950 contract. Finley counterclaimed, alleging among other things that the 1950 contract constituted a per se violation of Section 1 of the Sherman Act because it unlawfully tied the purchase of concession services to the extension of credit. Sportservice pleaded the statute of limitations, arguing "that Finley's suit is barred because it was not filed within four years of the last allegedly damaging act, the amendment or extension of the contract to its complete 33-year duration in 1954." 512 F.2d at 1270. The Ninth Circuit rejected the argument:
 
 
 52
 A civil cause of action under the Sherman Act arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time. . . . (Sportservice's) argument overlooks the necessarily continuing nature of the alleged harm. As the Supreme Court stated in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968),
 
 
 53
 'We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. (Citation omitted.) Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm . . .'
 
 
 54
 512 F.2d at 1270. Thus the Ninth Circuit has read Hanover Shoe to mean that an antitrust cause of action continues to accrue so long as a defendant continues to accept benefits under or assert the validity of an allegedly unlawful tying contract.[20]
 
 
 55
 A number of district courts also have concluded that a defendant's continued enforcement of or receipt of benefits under a contract with a plaintiff may be injurious acts for which new antitrust causes of action for tying, price-fixing, exclusive dealing, or conspiracy accrue. For instance, in Lupia v. D'Oro Biscuit Co., (1974) Trade Reg.Rep. (CCH) P 75,046 (N.D.Ill.1972), appeal dismissed (7th Cir. 1973) (unreported), cert. denied, 417 U.S. 930, 94 S.Ct. 2639, 41 L.Ed.2d 232 (1974) plaintiff, a recently terminated franchisee of defendant, sued in 1972 for treble damages, alleging that the distributorship contract between himself and defendant had contained exclusive dealing, territorial restriction, and price-fixing clauses unlawful under Sections 2(a) and 2(c) of the Robinson-Patman Act, Section 1 of the Sherman Act, and Section 3 of the Clayton Act. Defendant moved to dismiss, alleging that the statute of limitations barred the action because the distributorship contract complained of was executed in 1963, nine years before suit was commenced.
 
 
 56
 Plaintiff, in turn, argued that the injurious acts of the defendant had continued throughout the life of the contract (terminated in 1971), in that defendant had enforced and accepted benefits under the exclusive dealing and price-fixing provisions of the contract throughout that period. The district court, accepting plaintiff's argument, cited Zenith, text and notes at notes 13-14 supra, for the proposition that "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." (1974) Trade Reg.Rep. (CCH) P 75,046, at 96,686. Then, relying on Baker v. F&F Investment, test and notes at notes 17-19 supra, and Weber v. Consumers Digest, Inc., note 19 supra, the court stated that "in the context of a continuing contractual relationship between plaintiff and defendant analogous to the one we have here, the 'overt acts' continue for as long as the relationship continues." Id.
 
 
 57
 In Schokbeton Products Corp. v. Exposaic Industries, Inc., 308 F.Supp. 1366 (N.D.Ga.1969) Judge Henderson faced a similar problem. In May of 1964 plaintiff and defendant executed a contract by which plaintiff granted defendant a license to use his patented manufacturing process, in return for defendant's agreement to pay plaintiff certain royalties. In April of 1968 plaintiff exercised its contractual right to cancel the contract, and some time after an unsuccessful demand it sued defendant for royalties claimed to be due under the contract.
 
 
 58
 Defendant counterclaimed for treble damages, alleging that his contract with plaintiff had contained territorial restrictions and tying agreements unlawful under the antitrust laws. Plaintiff moved to dismiss the counterclaim on the ground that any cause of action plaintiff might possess accrued when the contract was executed, more than four years before suit was commenced. Judge Henderson, quoting note 15 of Hanover Shoe, held that defendant's efforts to enforce provisions of the contract within the limitation period were such acts as would cause new causes of action to accrue for plaintiff. 308 F.Supp. at 1367-69. He therefore denied plaintiff's motion to dismiss defendant's counterclaim. In the margin we cite other district court cases that we believe support or are consistent with this position, including two more that were cited with approval in Poster Exchange, supra.[21]
 
 
 59
 We find the reasoning underlying this line of cases persuasive. The cases are consistent with Zenith and Poster Exchange, in that accrual of a plaintiff's cause of action is based on injurious acts committed by the defendant within the limitations period. It also seems reasonable to us not to permit a defendant to argue that a suit to recover damages caused by his recent acts is barred because a pre-limitations contract between himself and plaintiff, alleged to be unlawful in itself or the product of an unlawful conspiracy, purports to authorize the commission of such acts. Such defendants hardly are in a position to argue for the protection of the statute of limitations on the traditional ground that " 'evidence has been lost, memories have faded, and witnesses have disappeared,' " American Pipe and Construction Co. v. Utah, 414 U.S. 538, 544, 94 S.Ct. 756, 762, 38 L.Ed.2d 713 (1974), Quoting Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348-49, 64 S.Ct. 582, 88 L.Ed. 788 (1944), when it is the defendants' own recent conduct that results in a finding of a newly accruing cause of action. See Hanover Shoe, supra, 392 U.S. at 502 n. 15, 88 S.Ct. 2224.
 
 
 60
 The defendants in this case place primary reliance on Muskin Shoe Co. v. United Shoe Machinery Corp., 167 F.Supp. 106 (D.Md.1958); Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 193 F.Supp. 401 (S.D.N.Y.1961), and Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956) to support the proposition that, in cases of the kind under discussion here, a plaintiff's only cause of action accrues when he executes the contract of which he complains, and not when defendants commit acts under the contract's authority. We do not find these cases compelling. In Muskin Shoe another plaintiff sued the same defendant as in Hanover Shoe, supra, alleging the same conduct. As in Hanover Shoe, defendant argued that plaintiff's causes of action accrued when plaintiff entered the leases in question, and not when plaintiff made payments under the leases. Although the district court accepted this argument in Muskin Shoe, 167 F.Supp. at 111-12, both the district court and the court of appeals in Hanover Shoe expressly refused to follow its holding. 245 F.Supp. at 295-96; 377 F.2d at 794 n. 3. We therefore view the Supreme Court's affirmance on the statute of limitations question in Hanover Shoe as undermining the persuasiveness of Muskin Shoe.
 
 
 61
 Skouras Theatres held that the antitrust conspiracy cause of action of plaintiffs, who had entered allegedly unlawful pooling agreements with defendants, accrued when plaintiffs executed the pooling contracts, and not when defendants committed subsequent injurious acts pursuant to the agreements:
 
 
 62
 The injury was inflicted when the agreement was made and the consequent overt acts resulting from the agreement were merely damages which flowed from the original agreement.
 
 
 63
 193 F.Supp. at 406. As should be clear by now, however, we cannot accept the position that injurious acts committed against a plaintiff by a defendant are immunized from suit simply because an allegedly unlawful pre-limitations contract purports to authorize the commission of such acts. We therefore reject the holding of Skouras Theatres.
 
 
 64
 In Steiner plaintiff leased her movie theater to one of the defendants in the pre-limitations period; the term of the lease extended into the limitations period. Plaintiff's allegation was that that defendant and other defendants had conspired to monopolize the first-run motion picture industry and that, in doing so, they had forced her to lease the theater on less favorable terms than she otherwise would have received. Plaintiff alleged that the execution of the lease was an overt act pursuant to the conspiracy injurious to her, and that defendants' closing of the theater within the limitations period also was. The Ninth Circuit held that plaintiff was barred from suing for damages resulting from the execution of the lease, but not from suing for damages resulting from closing of the theater. 232 F.2d at 194-95, 198. That court was not asked to decide, nor need we, whether defendant's payment of rental to plaintiff under the lease within the statutory period constituted acts that could be said to have damaged plaintiff. What we do know is that the Ninth Circuit would not view the fact that the leases were executed outside the statutory period as barring suit for injurious acts committed under them within the period. See Twin City Sportservice, supra.[22]
 
 
 65
 B. This Case. Although the parties might expect that what we have said thus far is conclusive on the question here, we detect one further twist in this case which is absent from the cases reviewed above. The typical form of tying agreement is one whereby plaintiff agrees with a single defendant to buy both "A" (the tying product) and "B" (the tied product) from that defendant. Under our analysis above, in such a case the defendant's collection of payment for "B" under the agreement within the limitations period would cause new causes of action to accrue for plaintiff, even if the tying contract itself was executed in the pre-limitations period.
 
 
 66
 In the instant case, the alleged tying agreement takes a slightly different form. The agreement between Drexel Properties and plaintiffs is that if plaintiffs want to buy "A" (the condominiums) from Drexel Properties, they must agree to buy "B" (the lease) from Mangurian, who is president and sole stockholder of Drexel Properties. Mangurian, it should be noted, is not alleged to be a party to the tying agreements themselves, but only to the lease. From this, defendants might argue (although they do not) that Mangurian is an innocent third party to the alleged tying agreements, who is enforcing and collecting benefits under the lease and not the tying agreements. Thus, they might conclude, under our own analysis Drexel Properties cannot be sued on the tying agreements because it has committed no act under the agreements within four years of suit, and Mangurian cannot be sued because he has not either.
 
 
 67
 This argument, however, would prove too much. It would imply that Mangurian could not be held liable on account of the tying agreements at all, because he was not a party to them and does not act under them. Such is not the law. While the more common form of tying agreement is one whereby plaintiff agrees with a single defendant to buy both "A" and "B" from that defendant, the form we see alleged here where plaintiff, by a contract with one defendant, is required to buy the tied product from a legally separate but either controlled or controlling defendant also is condemned by the antitrust laws. In such cases, if the tying agreement itself is found to be unlawful, then both the seller of the tying product (who is a party to the tying agreement) and the seller of the tied product (who is not a party to the tying agreement itself) may be held liable as members of a conspiracy to restrain trade by means of the tying agreement. See, e. g., Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).[23] And in such cases, it is plain that the defendant who sells the tied product, but who is not a party to the tying contract itself, commits overt acts in furtherance of the conspiracy whenever he collects payment for the tied product from the plaintiff. Indeed, such collections are the very goal of such a conspiracy. Hence, under Zenith and Poster Exchange, a new cause of action for conspiracy should accrue upon the commission of each such act of collection.[24]
 
 
 68
 In the instant case, plaintiffs have alleged just this kind of conspiracy, together with Mangurian's acts of collection for the tied product. It is immaterial that these acts are sanctioned by the lease, which on its face is lawful; for the essence of the complaint is that Mangurian conspired with Drexel Properties to force plaintiffs, by means of an unlawful tying agreement, to become parties to the lease, and hence bound to pay Mangurian for the tied product. Plaintiffs here thus are in a position very similar to that of the plaintiffs in Baker v. F&F Investment, supra, who complained of
 
 
 69
 a conspiracy among defendants, the object of which was establishment of a continuing relationship with individual plaintiffs.
 
 
 70
 420 F.2d at 1200. The lease here, like the installment sales contracts in Baker v. F&F Investment, is alleged to be the facially lawful product of an unlawful conspiracy between defendants. Here, as there, collections under that contract are acts in furtherance of the alleged conspiracy behind it. We therefore hold that so long as Mangurian continues to collect rent from these plaintiffs under the lease, plaintiffs' causes of action for the conspiracy continue to accrue.
 
 
 71
 IV. POSTSCRIPT.
 
 
 72
 One final word is in order. The court below thought that a holding for plaintiffs here "would not encourage the vigorous enforcement of the antitrust laws through private actions" because "any plaintiff could sit on his rights, allowing damages to accumulate" through the term of the lease. 407 F.Supp. at 872. As even defendants concede, this fear is without foundation; for we adhere to the rule that plaintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit. That means that these plaintiffs now are barred from seeking rentals collected by Mangurian before that time. Under our holding, it still would have been to plaintiffs' advantage to have sued at the earliest possible moment. The fact that they did not, however, does not bar this suit.
 
 
 73
 REVERSED.
 
 
 
 *
 Senior District Judge for the Western District of Louisiana, sitting by designation
 
 
 [1]
 Specifically, we assume without deciding that the condominium units and lease are two separate products
 
 
 [2]
 Mangurian's wife Dorothy, who has dower rights in the leased land, also joined the lease and is named as a defendant
 
 
 [3]
 Florida statutory law creates the legal framework within which condominiums exist. See generally Fla.Stat.Ann. ch. 718 (Supp.1977) (West) (effective Jan. 1, 1977), repealing and replacing Condominium Act, 1963 Fla.Laws, ch. 63-35 (former Fla.Stat.Ann. ch. 711 (1969) (West))
 
 
 [4]
 Article III of the Declaration of Condominium, Record Vol. I at 4, provides:
 Each unit owner shall pay directly to the lessor the sum of One-Hundred-Forty-Eight & 50/100 Dollars, quarter annually, on January 1st, April 1st, July 1st and October 1st of each and every year during the term of that certain recreational lease entered into by DREXEL PROPERTIES, INC., lessee, and HARRY T. MANGURIAN, JR., as lessor. . . . It shall be a condition precedent to unit ownership that each apartment owner becomes a lessee of said recreational lease pursuant to an assignment of a One Five Hundred and Fifty Seconds ( 1/552nds) undivided interest therein, and pledge his apartment to the lessor as security for the performance of his duties thereunder.
 
 
 [5]
 A good deal of other contact among purchasers, Drexel Properties, and Mangurian apparently continued to take place. On September 23, 1972 a so-called "Settlement Agreement" was executed by Drexel Properties, both Mangurians, and officers of the not-for-profit association called Imperial Point Colonnades Condominium, Inc. (hereinafter the "Association") which represents all Imperial Point unit owners. (Florida law provides for formation of an "association" of unit owners to manage common areas, collect assessments, and perform other operations for the condominium as a whole. Fla.Stat.Ann. §§ 718.111-114 (Supp.1977) (West), repealing and replacing Condominium Act, 1963 Fla.Laws, ch. 63-35, §§ 12-13; 1965 Fla.Laws, ch. 65-9, § 1.) By this document Drexel Properties agreed to remedy a number of complaints relating to the construction of the condominium units. Drexel Properties and the Association agreed to cooperate in securing from each unit owner written acknowledgments ratifying and consenting to the Declaration of Condominium, supplements thereto, and the lease, and Drexel Properties agreed to take legal action against any unit owner who would not sign such an acknowledgment. Drexel Properties and the Association also released all claims against each other except those covered in the agreement
 By the same document the Mangurians, as lessors under the recreational lease, agreed to waive their right to a cost-of-living increase in rent under the lease prior to January 1, 1973. They also agreed to execute a "declaration of subordination," so as to subordinate their liens on the units for rent to certain first mortgages in favor of institutional mortgagees. They further agreed to amend the default provisions of the lease, including those provisions relating to "defaulting assignees."
 On December 1, 1972 plaintiff Thompson executed an instrument entitled "Joinder and Consent to Amendment of Declaration of Condominium of Imperial Point Colonnades Condominium." Record Vol. I at 125. By this document he "acknowledge(d) and ratif(ied) the terms of the Lease, as amended, between" Mangurian and Drexel Properties, as well as joining in and consenting to certain amendments to the Declaration of Condominium. (These latter amendments are not part of the record before us.) On February 8, 1973 the plaintiffs Wyant executed a similar document. Record Vol. I at 124.
 
 
 [6]
 The "recent legislation" referred to may have been Fla.Stat.Ann. § 718.401(8) (Supp.1977) (West), which declares void as against public policy escalation clauses in recreational leases
 
 
 [7]
 The record also contains a letter dated September 30, 1975 from an agent of Mangurian to a unit owner, not a party here, notifying him of default in payment on the lease and threatening foreclosure. Record Vol. III at 429
 
 
 [8]
 The complaint also named the Association as a plaintiff, but the court dismissed it as a party for lack of standing. Record Vol. III at 354; see Burleigh House Condominium, Inc. v. Buchwald, 546 F.2d 57 (5th Cir. 1977); Buckley Towers Condominium, Inc. v. Buchwald, 533 F.2d 934 (5th Cir. 1976). The complaint sought class certification, which the court denied. Record Vol. II at 237-39. Neither of these rulings is before us now
 
 
 [9]
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal
 
 
 [10]
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale on such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce
 
 
 [11]
 In separate counts, the complaint alleged various pendant state claims; it also alleged that the rent escalation clause violated the Gold Clause Joint Resolution of 1933, 48 Stat. 113, 31 U.S.C. § 463. The court dismissed all these other counts, Record Vol. I at 138-40, Vol. III at 354, and these rulings are not before us now
 
 
 [12]
 Before this section was enacted, treble-damage suits were subject to the various states' statutes of limitations. The section was intended to provide a uniform nationwide statute of limitations on treble-damage suits. See S.Rep. No. 619, 84th Cong., 1st Sess. 5 (1955); H.R.Rep. No. 422, 84th Cong., 1st Sess. 7 (1955)
 Section 4 of the Clayton Act, 15 U.S.C. § 15, provides the jurisdictional basis for private treble-damage suits:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 [13]
 See generally Wheeler & Jones, The Statute of Limitations for Antitrust Damage Actions: Four Years or Forty?, 41 U.Chi.L.Rev. 72 (1973); Wiprud, Antitrust Treble Damage Suits Against Electrical Manufacturers: The Statute of Limitations and Other Hurdles, 57 Nw.U.L.Rev. 29 (1962)
 
 
 [14]
 The Court went on to hold that there is an exception to this rule in cases where the defendant committed the act causing injury more than four years before plaintiff commenced suit, but where damages resulting from the act could not have been proven with the requisite certainty until more than four years after commission of the act. In such cases, the Court held, the cause of action does not accrue until damages can be reasonably established. 401 U.S. at 339-42, 91 S.Ct. 795; see Poster Exchange, Inc. v. Nat'l Screen Serv. Corp., 456 F.2d 662, 666-68 (5th Cir. 1972). This branch of Zenith is not involved in the instant case
 
 
 [15]
 This rule is, of course, subject to the Zenith exception, note 14 supra
 
 
 [16]
 The date of the Unit Owners' purchase of their respective units and assumption of obligations under the Lease is the controlling date, for as of that time, the last act was performed by the Developer in connection with completing the transaction and the effect or impact of the transaction as of that time was final
 Brief of Appellees at 6-7.
 
 
 [17]
 The district court distinguished Baldwin v. Loew's Inc., 312 F.2d 387 (7th Cir. 1963), where plaintiffs had alleged that defendants had conspired to coerce them into leasing their motion picture theatre on unfavorable terms to a third party, who was not named as a conspirator. Plaintiffs had executed the lease in the pre-limitations period, but their lessee had exercised an option to renew the lease within the limitations period. The court of appeals held that a new cause of action did not accrue upon the renewal of the lease. 312 F.2d at 390-91
 As the district court pointed out in Contract Buyers League, this result was correct because the renewal of the lease in Baldwin v. Loew's Inc. was not an act committed by a defendant. In Contract Buyers League, on the other hand,
 Defendants . . . are alleged to have been reaping unlawful benefits through continuing enforcement of their unlawful scheme. Indeed, the best indication of what would be the continuing infliction of injury are (defendants') efforts to collect on the contracts . . .
 
 
 [300]
 F.Supp. at 220
 
 
 [18]
 The court of appeals also agreed with the district court's treatment of Baldwin v. Loew's Inc., note 17, supra. 420 F.2d at 1200
 
 
 [19]
 The Seventh Circuit followed Baker in Weber v. Consumers Digest, Inc., 440 F.2d 729 (7th Cir. 1971). There plaintiff, who executed a covenant not to compete with defendants in the pre-limitations period, sued charging that the covenant was a tool of an unlawful conspiracy by defendants to restrain trade. The court of appeals held that one defendant's suit in state court against plaintiff to enforce the covenant, instituted within the limitations period, was an injurious act against plaintiff for which a new antitrust cause of action, not barred, accrued. Id. at 731
 
 
 [20]
 The Twin City court went on to hold that the cause of action for an unlawful tying agreement should be dismissed because two separate products were not involved in the alleged tie-in. 512 F.2d at 1276
 
 
 [21]
 Aamco Automatic Transmissions, Inc. v. Tayloe, 407 F.Supp. 430, 438 (E.D.Pa.1976) (holding antitrust causes of action by parties to illegal tying contracts, executed more than four years before plaintiffs commenced suit, barred where plaintiffs' payment for tied product also was completed more than four years before action was commenced); Material Handling Industries, Inc. v. Eaton Corp., 391 F.Supp. 977, 980 (E.D.Va.1975) (alternative holding) (holding antitrust cause of action by party to contract containing illegal tying and territorial provisions, executed more than four years before plaintiff commenced suit, not barred where contract was terminated within four years of commencement of suit); Monona Shores, Inc. v. United States Steel Corp., 374 F.Supp. 930 (D.Minn.1973) (assuming antitrust cause of action by party to contract tying purchase of product to extension of credit, executed more than four years before plaintiff commenced suit, accrued when defendant instituted foreclosure proceedings against plaintiff under credit agreement, also more than four years before plaintiff commenced suit); Metropolitan Dry Cleaning Machinery Co. v. Washex Machinery Corp., (1969) Trade Reg.Rep. (CCH) P 72,686, at 86,441 (E.D.N.Y.1968) (holding antitrust cause of action under § 3 of Clayton Act by party to exclusive dealing contract, executed more than four years before plaintiff commenced suit, not barred where contract remained in force within four years of commencement of suit); Roosevelt Raceway, Inc. v. Universal Controls, Inc., (1965) Trade Reg.Rep. (CCH) P 71,565 (E.D.N.Y.1965) (holding antitrust cause of action by party to contracts illegal under §§ 1 and 2 of Sherman Act and § 3 of Clayton Act, executed more than four years before plaintiff commenced suit, not barred where contract remained in force within four years of commencement of suit); Susser v. Carvel Corp., 206 F.Supp. 636, 651-52 (S.D.N.Y.1962), aff'd, 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965) (holding antitrust cause of action by parties for price-fixing under franchise contracts, executed more than four years before plaintiffs commenced suit, not barred where defendant abrogated price-maintenance clause within four years of commencement of suit), cited with approval in Poster Exchange, supra, 517 F.2d at 127; Cardinal Films, Inc. v. Republic Pictures Corp., 148 F.Supp. 156, 159-60 (S.D.N.Y.1957) (holding antitrust cause of action by party to illegal tying contract, executed more than four years before plaintiff commenced suit, not barred where defendant furnished tied product to plaintiff under contract within four years of commencement of suit), cited with approval in Poster Exchange, supra, 517 F.2d at 127
 
 
 [22]
 We likewise decline to follow these cases that defendants might have cited, but did not: Landon v. Twentieth Century-Fox Film Corp., 384 F.Supp. 450, 458 (S.D.N.Y.1974) (alternative holding) (holding that cause of action for allegedly unlawful tying agreement, the sale by plaintiff to defendant in 1944 of copyright together with renewal right, accrued in 1944 and not in 1972, when defendant exercised renewal right; states, "As a general rule, claims based on anti-competitive agreements to which the plaintiff is a party accrue at the time of their execution."); Fleischer v. A.A.P., Inc., 180 F.Supp. 717, 723-24 (S.D.N.Y.1959), aff'd on other grounds, 329 F.2d 424 (2d Cir. 1964) (holding cause of action for antitrust conspiracy, relying on overt acts committed within limitations period by defendant pursuant to contract between plaintiff and defendant executed outside limitations period, barred by statute of limitations); Sandidge v. Rogers, 167 F.Supp. 553, 557-58 (S.D.Ind.1958) (holding cause of action for antitrust action for antitrust conspiracy, relying on defendant's exercise of option to renew lease of land from plaintiff within limitations period where original lease was executed outside limitations period, barred by statute of limitations); cf. Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc., 153 F.Supp. 589, 592-94 (D.N.J.1957), aff'd on other grounds, 307 F.2d 210 (3d Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963) (holding antitrust cause of action for exclusion of plaintiff from United States drug market, relying on unlawful contract of sale of trademarks and patents executed in pre-limitations period by plaintiff's predecessor and defendant's predecessor, barred by statute of limitations because plaintiff alleged no overt acts of exclusion by defendants within limitations period)
 
 
 [23]
 In addition, the Supreme Court recently has suggested that in such cases the two entities' "common ownership and control (may) make it appropriate to regard the two as a single seller." United States Steel Corp. v. Fortner Enterprises, Inc. (Fortner II), --- U.S. ----, ----, 97 S.Ct. 861, 864, 51 L.Ed.2d 80 (1977). If this view is taken, the result in this case remains the same. See Part III.A. supra ; note 24 infra
 
 
 [24]
 It will be noted that this conclusion parallels the one we have posited in the more conventional one-defendant tying case. In the two-defendant case, as in the one-defendant case, it is necessary to collect from plaintiff for the tied product in order to reap the intended benefits of the tying agreement. In the two-defendant case, as in the one-defendant case, continued collection results in continuing accrual of the plaintiff's cause of action. Thus, a defendant cannot escape suit via the statute of limitations by splitting itself into two separate legal entities and causing one of them to force plaintiff to buy the tied product from the other one