591 F.2d 68
 1979-1 Trade Cases 62,529
 In re MULTIDISTRICT VEHICLE AIR POLLUTION.
AMF, INCORPORATED, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION, Ford Motor Company, Chrysler
Corporation, American Motors Corporation and
Automobile Manufacturers Association,
Inc., Defendants-Appellees.
 No. 76-1648.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 14, 1979.
 
 Howard Adler (argued), Bergson, Borkland, Margolis & Adler, Washington, D. C., for plaintiff-appellant.
 James G. Hunter, Jr. (argued), Hedland, Hunter & Lynch, Chicago, Ill., Philip K. Verleger (argued), of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before SNEED and HUG, Circuit Judges, and EAST,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This is an appeal from summary judgments in a treble damage antitrust action brought by appellant AMF, Incorporated ("AMF") against appellees, four major American automobile manufacturers and their trade association. AMF claims that appellees, acting in concert, by agreeing not to purchase AMF's device, excluded it from the early market in methods to limit and control air pollution, and that such action caused commercial injury cognizable under Section 4 of the Clayton Act, 15 U.S.C. § 15. Following the close of discovery, appellees moved for summary judgment contending that (1) the industry's rejection of the AMF device was strictly the result of unilateral decisions by each automobile company; (2) there never was an AMF device to boycott because only a prototype had been certified by the California Motor Vehicle Pollution Control Board ("MVPCB"); (3) AMF's action was barred by the statute of limitations; and (4) AMF had transferred relevant documents to another company or lost them when it terminated its exhaust control device business. Appellee Chrysler moved separately for summary judgment on the added ground that it had at all times been firmly committed to its own device. The district court granted the appellees' motions for summary judgment with respect to all issues relevant to this appeal. As we agree that the four-year statute of limitations in 15 U.S.C. § 15b barred this action, we affirm without reaching the district court's other grounds.
 
 I.
 FACTS.
 
 2
 AMF commenced this action on October 23, 1970, charging that appellees conspired to restrain trade and monopolized in violation of Sections 1 and 2 of the Sherman Act. The roots of this alleged conspiracy extend back to the early 1950's, when appellees entered into a cooperative program to study and remedy problems generated by emissions from internal combustion engines. One part of the joint program included a cross-licensing agreement for patents developed by any party. AMF further alleges that within this overall conspiracy appellees, in 1964, formed a conspiracy specifically intended to exclude it from the developing market for automobile emission control equipment.
 
 
 3
 In 1961 AMF entered into a program to develop an afterburner designed by Charles Morris; AMF termed its device the "Smog Burner." Afterburners reduce emissions by further combustion of exhaust gasses. They are "hang on" devices, in that they are attached toward the end of the exhaust system, and are not integral parts of the engine itself. Although various appellees had experimented with afterburner devices, none was concentrating its own internal development upon such a device in 1964. At that time no state or federal agency mandated particular emission control standards. Under California law, however, the MVPCB was authorized to issue "Certificates of Approval" to pollution control devices found capable of achieving certain standards. The law specified that as soon as the MVPCB certified two such devices, a provision requiring all new automobiles sold within the state to meet established emission requirements would become effective. AMF submitted a prototype of its device to the MVPCB, and on June 17, 1964, the MVPCB certified AMF's prototype along with three other emissions control methods, none of which were afterburners. At that time, no appellee had a device that had received certification. Nevertheless, as of June 17, 1964, California law required appellees to seek exemptions or meet the established emission requirements in the 1966 model year, which commenced in the Fall of 1965.
 
 
 4
 AMF cites several actions on the part of appellees which indicated a joint decision to exclude parties outside of the industry cooperative program from the market in these devices. Specifically, after concerted discussion, appellees each announced at an August 12, 1964 MVPCB meeting that they would install industry-developed emission control systems in 1966 models and would refrain from using AMF's Smog Burner or any of the other previously certified devices. At various times each appellee directly contacted AMF to this effect, the last such refusal coming from American Motors in October. According to an internal AMF memorandum dated October 29, 1964, AMF was unable to get any appellee to consider the Smog Burner even for vehicles for which exemption from the California requirements was requested. In October when American Motors Corporation, after testing of the AMF device, stated that it would not use the Smog Burner, AMF personnel had concluded that a conspiracy to exclude them existed.
 
 
 5
 In November the MVPCB denied certification for use on used cars to the only device, other than AMF's, that had applied for such certification, with the consequence that California's provisions requiring the installation on used cars did not go into effect. By December, AMF had begun to decrease its staff working on the Smog Burner project. AMF had foreseen two possible markets for the device new and used cars and neither had developed. On January 7, 1965, the MVPCB met to consider exemption requests by appellees for certain models; AMF did not attend. AMF did not send a representative because, as its management stated, it had a "conviction that no purchase orders for Smog Burners would emanate from any Detroit manufacturer." An AMF representative contacted two Ford engineers in April of 1965, asking whether Ford had any new interest in the Smog Burner; he received a negative response. Finally, a letter to International Harvester, not named as a defendant in AMF's suit, sent in February 1965 quoted prices of the device, but did not indicate production capability.
 
 
 6
 During this period, each of the appellees worked on an emission control system for its cars. Chrysler developed its own "Clean Air Package" (CAP), and the other three manufacturers adopted an air injection system operated with an air pump supplied by GM. Each of the appellees did some testing with the AMF prototype during the Summer of 1964, but only AMC ever tested a production model. Chrysler's CAP system was certified in November 1964, but none of the other three manufacturers received certification or exemption until the Spring of 1965.
 
 II.
 
 7
 LIMITATIONS.
 
 
 8
 Appellant filed this suit on October 23, 1970. 15 U.S.C. § 15b establishes the applicable limitations: "Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years After the cause of action accrued " (emphasis added). The government commenced a civil suit against these same appellees, however, on January 10, 1969. 15 U.S.C. § 16(b) suspends the running of the statute of limitations for "every private right of action . . . based in whole or in part on any matter complained of" in the private action during the pendency of and for one year after any antitrust action commenced by the United States. The government suit was settled by consent decree October 29, 1969, within one year of AMF's filing this suit. We therefore focus our attention on January 10, 1965, four years prior to the commencement of the government action, as the critical date for limitations purposes.[1] If appellant's action had accrued before that date, this action is barred by 15 U.S.C. § 15b.
 
 
 9
 Previously, we have stated: "A civil cause of action under the (antitrust laws) arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time." Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1270 (9th Cir. 1975). Under two possible theories, AMF's cause of action arose on January 10, 1965 or thereafter. First, if appellees committed overt acts which damaged AMF, in furtherance of a conspiracy, on January 10, 1965 or thereafter, those acts are not barred. Second, if damages attributable to appellees' actions prior to January 10, 1965, were speculative, or their amount and nature were unprovable, as of that date, then AMF's action to recover those damages is not barred. We treat each of these possibilities in turn.
 
 
 10
 A. Continuing Conspiracy.
 
 
 11
 It is well established that a plaintiff's cause of action for damages under the antitrust laws is not barred simply because a conspiracy was formed outside the limitations period. The Supreme Court clarified the point at which an antitrust cause of action accrues in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).
 
 
 12
 Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . This much is plain from the treble-damage statute itself. 15 U.S.C. § 15. In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.
 
 
 13
 401 U.S. at 338, 91 S.Ct. at 806.
 
 
 14
 Cf. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (damages not barred by limitations may be recovered in suit brought in 1955 for injury caused by prohibited practice begun in 1912 and continued through date of suit). AMF can recover only for damages Caused by forbidden "overt acts" of the conspirators within the limitations period. Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd., 185 F.2d 196, 208 (9th Cir. 1950), Cert. denied, 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951). In this case we find the undisputed record indicates that appellees' decisions not to purchase the afterburner devices from AMF were final prior to January 10, 1965. AMF's exclusion from the afterburner market was complete prior to January 10, 1965. No forbidden "overt acts" occurred thereafter; appellees merely supplied their needs from sources other than AMF. AMF's position resembles that of a disappointed patron of the theater. When turned away from the theater at eight o'clock because the performance is sold out, his exclusion occurs at eight, not during the performance or when it concludes at eleven o'clock. Pari ratione, AMF's cause of action arose before January 10, 1965 and is barred by 15 U.S.C. § 15b.
 
 
 15
 AMF argues, however, that appellees' rejection of its device prior to January 10, 1965 was not a final rejection. To continue the theater example, it argues that it was not irrevocably excluded at eight o'clock but rather was told to call again just before curtain time at eight-thirty. Exclusion, therefore, could not be final until eight-thirty. Specifically, it argues that under Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.), Cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), the refusal to deal was not final, and that each day without an order constituted a new cause of action. To support this view, AMF points to asserted new refusal by Ford and International Harvester in early 1965 as forbidden "overt acts" of the continuing conspiracy. It also argues that pricing announcements and other activity by appellees to achieve certification of their methods constituted similar acts.
 
 
 16
 We note to begin with that Flintkote was concerned with the period of time for which damages were recoverable, not the period of time within which suit must be brought. It limited damages suffered from a continued refusal to deal to those prior to the filing of suit. Recompense for wrongful acts subsequent to the suit must be sought in later suits. Here the question is whether AMF's injury was the consequence of multiple wrongs or a single irrevocable and permanent injury. If the injury was final during 1964, then the purpose of 15 U.S.C. § 15b as a statute of repose should be served. See Dungan v. Morgan Drive-Away, Inc., 570 F.2d 867 (9th Cir.), Cert. denied, --- U.S. ----, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). This purpose has been described as follows: "The function of the limitations statute is simply to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring proof of wrongs imbedded in time-passed events." Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117, 127 (5th Cir. 1975), Cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976).
 
 
 17
 In Poster Exchange, supra, the Fifth Circuit clearly distinguished between injury final at its inception and a continuing wrong. A conspiracy had excluded Poster Exchange from access to supplies for a period stretching beyond the four-year limitations period. The court, unable to determine whether during the limitations period there was "a mere absence of dealing, or whether there was some specific act or word" of a wrongful nature, remanded for a determination of whether such acts or words occurred within the period. 517 F.2d at 128. Nevertheless, the court recognized:
 
 
 18
 Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.
 
 
 19
 Id. at 126-27.
 
 
 20
 The Fifth Circuit recently adhered to this principle when it observed: "(W) here all the damages complained of necessarily result from a pre-limitations act by defendant, no new cause of action accrues for any subsequent acts committed by defendant within the limitations period Because those acts do not injure plaintiff." Imperial Point Colonnades Condominium, Inc. v. Mangurian, 549 F.2d 1029, 1035 (5th Cir.), Cert. denied, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977) (emphasis original).
 
 
 21
 These views support our disposition of this case. Any injury to AMF is attributable to the final denials by the appellees in 1964. Contacts initiated by AMF to Ford and International Harvester do not indicate otherwise. These, to continue the theater example, were not invited pre-curtain calls at the box office; rather they were forlorn inquiries by one all of whose reasonable hopes had been previously dashed. That is, appellees had indicated clearly and irrevocably an intent to look to their own devices or modifications thereof for the 1966 model year. The original equipment supply market to automobile manufacturers differs substantially from other supplier relationships. Any part must be integrated into the full car design. Planning is essential, and planning requires lead time. In this case, the record indicates that AMF itself was convinced by the last quarter of 1964 that it was out of the market. By that time, AMF had even failed to gain access to the used car market. The staff for the Smog Burner was substantially disassembled in December 1964. AMF failed to have a representative attend a January 7, 1965 MVPCB meeting in part because it believed appellees would not order from it. Whatever hope of business AMF may have clutched, its source could not have been actions or words of the appellees. Nothing in the record indicates other than that the 1964 decisions, as to AMF, were irrevocable, immutable, permanent and final. For this reason, all injury to AMF necessarily resulted from the 1964 rejection of the Smog Burner. Acts subsequent to January 10, 1965, to use the language of Poster Exchange, were "but unabated inertial consequences of some pre-limitations action." 517 F.2d at 128.
 
 
 22
 B. Speculative Damages.
 
 
 23
 Turning to AMF's second ground for avoiding the bar of limitations, we acknowledge that the Supreme Court has recognized in Zenith Radio Corp. v. Hazeltine Research, Inc., supra, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77, that an accrual of damages can constitute the accrual of a cause of action even though all wrongful acts took place outside the limitations period:(E)ven if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.
 
 
 24
 . . . (R)efusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered . . . .
 
 
 25
 401 U.S. at 339, 91 S.Ct. at 806 (citations omitted).
 
 
 26
 This court interpreting Zenith, has stated:
 
 
 27
 Zenith stands for the proposition that a plaintiff may recover for acts violative of the antitrust laws committed prior to the statute of limitations date, but that he may only recover those damages for such acts which accrued and became ascertainable within the period of the statute.
 
 
 28
 Hanson v. Shell Oil Co., 541 F.2d 1352, 1361 (9th Cir. 1976), Cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Applying this standard, AMF could maintain this action if, as of January 10, 1965, its damages were speculative, or their amount and nature were unprovable.
 
 
 29
 Zenith did not establish new standards for determining whether damages are ascertainable as of a particular date.
 
 
 30
 The principal cases explaining the criteria for ascertaining whether damages are speculative remain Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-66, 51 S.Ct. 248, 75 L.Ed. 544 (1931). These cases teach that when the defendant's wrong has been proven, "the jury may make a just and reasonable estimate of the damage . . . . '(J)uries are allowed to act upon probable and inferential, as well as direct and positive proof.' " 327 U.S. at 264, 66 S.Ct. (574) at 580.
 
 
 31
 Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 573 (4th Cir. 1976).
 
 
 32
 In Bigelow and Story Parchment Co. the Court faced the question whether damages were too uncertain for a jury to award damages. It is distinguished uncertain Damage, which prevented recovery, from an uncertain Extent of damage, which did not prevent recovery; that is, the failure to establish an injury, from the not uncommon imprecision with regard to its scope. The Court emphasized that a wrongdoer should not profit from uncertainty caused by his own wrong. "The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery." Story Parchment Co., 282 U.S. at 565-66, 51 S.Ct. at 241.
 
 
 33
 In Zenith such a way was found. Damages arising more than five years after a 1954 agreement to exclude the plaintiff from the Canadian market were held to have been too speculative as of 1954 and thus not barred by a limitations period commencing in 1954. The Court sought to assure that antitrust plaintiffs would not suffer injury that could never be remedied. It believed the defendants could have prevented Zenith from any recovery for post-1958 damages in a 1954 suit by claiming that any injury past that date was speculative. Such also was the result in Ansul Co. v. Uniroyal, Inc., 448 F.2d 872 (2d Cir. 1971), Cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972), in which suit was brought in 1968 stemming from the 1963 termination of a distributorship agreement. The court held that damages accruing between 1964 and 1968 would have been too speculative for suit in 1963 and that, as a consequence, could be recovered in the 1968 suit.
 
 
 34
 The standard established in Story Parchment Co. does not always lead to a Zenith result, however. Thus in Charlotte Telecasters, supra, 546 F.2d 570, the Fourth Circuit held that future profits of a cable television system were not too speculative to be subject to proof. See El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978). Also in Monona Shores, Inc. v. United States Steel Corp., 374 F.Supp. 930 (D.Minn.1973), a district court held that the extent of damages flowing from a foreclosure subject to further judicial proceedings was ascertainable as of the date the foreclosure was commenced. The court stated:
 
 
 35
 It should be noted that the Zenith case does not require that the plaintiff have the best evidence possible of his damage, but rather only that the damages be provable. . . . (I)n some cases . . . damages are better proven at a later time. However, that does not mean at an earlier point in time, enough evidence of damage was not available to allow the issue to go to the jury.
 
 
 36
 374 F.Supp. at 936.
 
 
 37
 In this case each appellee during 1964 had expressed without qualification its intention not to use the Smog Burner. AMF admits that by the end of 1964, the size of the market for 1966 model year cars could be estimated with reasonable accuracy. AMF had been counting on this one year model market to establish its product; without it the Smog Burner project in late 1964 was being phased out. Appellees are accused of an absolute exclusion of AMF. No difficulties with projecting market share existed in late 1964 that do not exist today. We hold, therefore, that the undisputed facts establish that the fact of injury to AMF was certain prior to January 10, 1965, and that the extent of such damage was neither too speculative nor its amount or nature unprovable. This being the case, without regard to the other issues raised on appeal, this action is barred by 15 U.S.C. § 15b and the district court properly entered judgment for appellees.
 
 
 38
 AFFIRMED.
 
 
 
 *
 Hon. William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Appellees have argued that the government suit did not toll limitations because it was not "based in whole or in part on the matter complained" of in the suit by AMF. In light of our conclusion that limitations bars this suit even if 15 U.S.C. § 16(b) applies, we do not reach this question