### WOODBRIDGE PLASTICS, INC., Plaintiff,

v.

### BORDEN, INC., Pickwick International, Inc., and Keel Manufacturing Corporation, Defendants.

No. 78 Civ. 5709.

United States District Court, S. D. New York.

July 2, 1979.

George R. Osborne, New York City, for plaintiff.

Rogers & Wells, New York City, for defendant Borden, Inc., by Guy C. Quinlan, Michael Luskin, New York City, of counsel.

Gadsby & Hannah, New York City, for defendants Pickwick Intern., Inc. and Keel Mfg. Corp., by Robert A. Trevisani, William A. Zucker, Boston, Mass., Paul F. Hannah, New York City, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Woodbridge Plastics, Inc. ("Woodbridge") brought this action against defendants Borden, Inc. ("Borden"), Pickwick International, Inc. ("Pickwick"), and Keel Manufacturing Corporation ("Keel") for violations of the federal anti-trust laws and for intentional interference with contractual relations. Each of the defendants has moved for dismissal of the anti-trust claims as time-barred. Borden has also moved for dismissal of the claim of intentional interference for lack of subject matter jurisdiction. For reasons that follow, we grant each of these motions.[1]

The following facts emerge from the complaint and the affidavits submitted by plaintiff Woodbridge:

From 1961 to 1975, Woodbridge was engaged in the manufacture of plastic compounds, mainly a copolymer resin used in the record industry. Its principal supplier of raw materials for this compound was

---

1. Because of our disposition of the case, we need not reach the other contentions advanced by defendants in support of dismissal.

Borden. Keel and Keel's corporate parent, Pickwick, were its principal customers. Together, these two firms had accounted for some 50–60% of Woodbridge's sales of the compound. Their dealings with Woodbridge were governed by a three-year supply contract entered into in May of 1973. Shortly after that contract was formed, Borden notified Woodbridge that there was a shortage of the raw materials used in manufacture of the compound, and that Borden would therefore be able to supply Woodbridge with resin in only limited quantities. The quantities it actually supplied in the ensuing period were too low for Woodbridge to meet its customers' needs.

Not surprisingly, Keel and Pickwick became dissatisfied with Woodbridge's performance. In July of 1974, they contracted to have their needs satisfied directly by Borden. Although Borden in its dealings with Woodbridge maintained that raw materials were in short supply, the July 1974 contract called upon it to supply Keel and Pickwick over a five-year period with quantities so great that they would need no other source. Moreover, under the July understanding, Keel and Pickwick were to construct or come into the control of a processing plant that would enable them to process their own resin compounds, thereby eliminating Woodbridge's former role in the manufacture. As the complaint alleges, "the necessary consequence of their contract was to preclude Keel and Pickwick from purchasing any additional copolymer resin from Woodbridge." That was indeed the result.

By letter dated September 6, 1974, Keel gave Woodbridge written notice "that it considers the contracts [pursuant to which Woodbridge supplied Pickwick and Keel] terminated" and would shortly commence an arbitration proceeding to obtain an official endorsement of that view. Woodbridge had previously learned, in August of 1974, that Keel and Pickwick had contracted with

a "major supplier"; it learned in "early November" that this "major supplier" was Borden. On November 22, 1974, Woodbridge wrote Keel offering to supply a quantity of resin compound under the repudiated May, 1973 contract, to which offer Keel never responded. On November 8, 1974, Borden began supplying Pickwick with resin. On December 1, 1974, the July contract by its terms went into effect. On December 31, 1974, Keel commenced an arbitration proceeding as it had indicated it would in the September 6th letter. Woodbridge's last transaction with Borden was a sale of resin on November 12, 1974.[2] Woodbridge did not commence this action until November 29, 1978.

Woodbridge asserts five causes of action. The first is a state common law claim against Borden for intentional interference with contractual relations. The second, against all defendants, is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which outlaws conspiracies in restraint of trade. The third, against Borden, is a price discrimination claim under the Robinson Patman Act, 15 U.S.C. § 13, its essential allegation being that Borden "discriminated in price . . . by charging Woodbridge higher prices than were charged other customers, in particular the defendants Pickwick and Keel, for goods of a like grade and quality." The fourth, against all defendants, is brought under Section 3 of the Clayton Act, 15 U.S.C. § 14, which proscribes contracts which condition sales on the "agreement or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller." In its fifth and final claim Woodbridge seeks an injunction against defendants' "continuing violations of the anti-trust laws."

We will first discuss the anti-trust claims before turning to the state law claim.

---

**2.** Unlike the other facts we rely upon, this fact does not appear in the complaint or affidavits submitted by Woodbridge. It was, however, among the assertions advanced by Borden in its 9(g) statement and supported by the asser-

tions in the affidavit of Elliot Linsky, the marketing manager of Borden's Thermoplastics Division. Since Woodbridge does not dispute this assertion, it is deemed admitted.

*Discussion*

## I. The Anti-trust Claims.

The statute of limitations applicable to civil anti-trust actions is the four-year statute set out in 15 U.S.C. § 15b:

"Any action to enforce any cause of action under . . . this title shall be forever barred unless commenced within four years after the cause of action accrued."

This section was interpreted by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.* (1971) 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77. As that case makes clear, an anti-trust claim arises at each time the plaintiff's interest is invaded to his damage and the statute of limitations commences to run with respect to each such injury-causing act when it is committed (401 U.S. at 338–39, 91 S.Ct. at 806):

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. [citations omitted] This much is plain from the treble-damage statute itself. 15 U.S.C. § 15. In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."

Cf. *Korry v. Intern. Tel. & Tel. Corp.* (S.D. N.Y.1978) 444 F.Supp. 193, 195–96. Applying this reasoning to the instant case, we must determine whether Woodbridge was harmed by any act of any defendant occurring after November 28, 1974, that is, within the four-year period preceding the commencement of this suit. We conclude that plaintiff was not harmed by any such act.

As the complaint makes clear, all of the injury to plaintiff was caused by Keel's and Pickwick's July, 1974 agreement to obtain from Borden all of the resin needed for their operations. Quoting again from the complaint, "the necessary consequence of their [July, 1974] contract was to preclude

Keel and Pickwick from purchasing any additional copolymer resin from Woodbridge." Woodbridge learned of the existence of this contract in August of 1974 and was informed the following month that Keel and Pickwick considered their contractual relationship with Woodbridge to be terminated.

These actions rendered the loss of Keel's and Pickwick's business a *fait accompli* long before November 28, 1974. As the Court of Appeals for the Fifth Circuit has observed, "where all damages complained of necessarily result from a pre-limitations act by defendant, no new cause of action accrues for any subsequent acts . . . because those acts do not injure plaintiff." *Imperial Point Colonnades Condominium, Inc. v. Mangurian* (5th Cir. 1977), 549 F.2d 1029, 1035, *cert. denied* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (emphasis in original). This observation, we believe, has force here.

The recent case of *In re Multidistrict Vehicle Air Pollution (MVAP)* (9th Cir. 1979) 591 F.2d 68 involved a factual situation somewhat similar to the one at bar. In *MVAP*, the plaintiff claimed that the defendant automobile manufacturers had agreed in violation of the Clayton Act to refrain from purchasing plaintiff's Smog Burner device. Each of the defendants had announced their intention to refrain from such purchase at a meeting in 1964, more than four years prior to the commencement of suit. Their only actions within the four-year period were to adhere to this position and reject renewed requests by plaintiff to sell its product. The Court of Appeals affirmed the dismissal of the complaint as time-barred, finding any injury to plaintiff to have been attributable to the final denials in 1964. The Court characterized the later, reiterated rejections as nothing more than the " 'unabated inertial consequences of some pre-limitations action.' " *Id.* at 72, quoting *Poster Exchange, Inc. v. National Screen Serv. Corp.* (5th Cir. 1975) 517 F.2d 117, 128, *cert. den.* 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793, 431 U.S. 904, 97 S.Ct. 1697, 52 L.Ed.2d 388. See also *Charlotte*

*Telecasters v. Jefferson-Pilot Corp.* (4th Cir. 1976) 546 F.2d 570.[3]

In the instant case there were not even any reiterated requests or refusals within the limitations period. The only post-November 28, 1974 action upon which Woodbridge relies is the commencement on December 31, 1974 of an arbitration proceeding. By commencing such a proceeding, Keel was merely carrying out an intention it had announced some four months earlier, in the September 6th letter notifying Woodbridge that it considered their contract terminated and would be initiating arbitration. The complaint belies any suggestion that this event caused Woodbridge any of the economic injuries of which it complains. Nor was the initiation of arbitration necessary to make the extent of Woodbridge's injuries ascertainable rather than speculative. Those injuries could have been as easily measured before November 28, 1974, by which time Woodbridge already knew that it had lost Keel and Pickwick as customers because of their contract with Borden.[4]

Nor do we find any significance in the fact that December 1, 1974 was the date defendants had agreed upon in July of 1974 as the date Borden was to begin making shipments to Pickwick. In fact, the first such shipment was made some three weeks earlier, on November 8, 1974. By November 28, 1974, Woodbridge had learned that Keel and Pickwick had contracted with Borden to obtain all of the supplies they need-

ed. It also knew that its business dealings with Keel and Pickwick had ceased some months earlier and that those corporations considered their contract with Woodbridge to have been terminated. Since all of the events causing Woodbridge's injuries occurred more than four years prior to the commencement of this suit, we dismiss as time-barred the claims under the Sherman and Clayton Acts.

The price discrimination claim is time-barred as well. There is no dispute but that Borden's last sale to Woodbridge was made on November 12, 1974, more than four years before the commencement of this action.[5]

## II. *The State Law Claim.*

We now turn to the state law claim for intentional interference with contractual relations.[6] Borden moves to dismiss the claim for lack of subject matter jurisdiction. Woodbridge contends that the case is properly here under this court's diversity jurisdiction.

The diversity statute, 28 U.S.C. § 1332(c), provides that for purposes of that section a "corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." See generally, 1 Moore's Federal Practice ¶ 0.77[2.–1] (1978).

According to the complaint, Woodbridge is a New Jersey corporation with its principal place of business in that state, and

---

3. In *Charlotte Telecasters,* as in the case at bar, the defendants met with silence an overture to do business made by plaintiff slightly more than four years prior to the commencement of suit. The Court of Appeals for the Fourth Circuit, in affirming the lower court's grant of summary judgment, held that such silence "does not constitute an overt act." *Id.* 546 F.2d at 573. Woodbridge does not here contend that defendants' inaction in response to the November 22 letter is an overt act within the limitations period.

4. Woodbridge does not suggest that it had no means of knowing in November of 1974 whether it might be able to find other customers for its product. Compare *Ansul Company v. Uniroyal, Inc.* (2d Cir. 1971) 448 F.2d 872. Pickwick and Keel ceased doing business with Woodbridge some months earlier and Wood-

bridge had ample time to find new outlets if any were available.

5. Borden has submitted affidavits attesting that there was no price disparity during November of 1974. Woodbridge has not advanced any facts in response tending to suggest that there was a price disparity in this or any other period.

6. Defendants Keel and Pickwick had moved to dismiss this claim as against them on the theory that they could not be charged with inducing their own breaches of contract. Recognizing the obvious merit in this position, Woodbridge has withdrawn the claim against these two defendants and now asserts this claim only against Borden.

Borden is a Delaware corporation with its principal place of business in New York. Were these allegations correct, there would be the requisite diversity between the parties. However, Borden has challenged these allegations and Woodbridge has modified its position in response.

Borden's affidavits and exhibits demonstrate that it has been incorporated since 1969 under the laws of the state of New Jersey. Woodbridge, abandoning the allegation of its complaint, now asserts it is a Delaware corporation, and supports that assertion by copies of its charter incorporating it in that state. In its memorandum of law it asserts that it has not done business in New Jersey since 1975, when it terminated its manufacture and sales operations. Woodbridge now maintains that its only activity since 1976 has been the winding up of its affairs through a New York office, thus conceding that New York was its principal place of business when the complaint was filed. Although the complaint alleges that New York is Borden's principal place of business as well, Woodbridge now urges us to consider Massachusetts as Borden's principal place of business on the theory that that state is the home of Borden Chemical, the corporate division with which Woodbridge dealt. Woodbridge does not suggest that the activities of Borden Chemical are so extensive (relative to the rest of Borden's operations) as to make the division's home the principal place of business for the entire corporation. Rather, its position seems to be that our inquiry should focus upon the division's principal place of business, instead of the corporation's.

■ We reject this theory. The defendant is Borden, Inc. and it is the citizenship of Borden, Inc. that we must determine. Any other approach would be inconsistent with Congress' desire to insure that even a corporation doing substantial business in several states "would be regarded as a citizen of that one of the States in which was located its principal place of business." S.Rpt. No. 1830, 85th Cong. 2d Sess., to accompany H.R. 11102, 2 U.S.Code Cong. & Admin.News (1958) p. 3102. As Professor Moore has noted, "it was anticipated that every corporation would have one, and only one, principal place of business." 1 Moore's Federal Practice ¶ 0.77[3.–1], 717.60, ¶ 0.77[1.–2]. Also see *Kelly v. United States Steel Corporation* (3d Cir. 1960) 284 F.2d 850, 853 (corporate defendant with fourteen divisions). Since there is no question but that both Woodbridge and Borden (as distinguished from the Borden Chemical division) have their principal places of business in New York, there is no diversity.

■ Having dismissed the federal claims, we cannot retain jurisdiction over the state law claim as pendent to any federal cause of action. *United Mine Workers v. Gibbs* (1966) 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218. The intentional interference claim is accordingly dismissed.[7]

### Conclusion

In summary, we dismiss plaintiff's antitrust claims as time-barred and dismiss the state law claim for lack of subject matter jurisdiction.

The clerk is directed to enter judgment dismissing the complaint.

SO ORDERED.

---

7. Although the parties did not brief this issue, it appears that the statute of limitations would provide an independent basis for dismissal were New York law to apply. New York courts have applied CPLR § 214(4)'s three-year limitations period to claims of intentional interference. See *Van Dussen-Storto Motor Inn, Inc. v. Rochester Telephone Co.* (4th Dept. 1978) 63 A.D.2d 244, 407 N.Y.S.2d 287; *Williams v. Arpie* (3d Dept. 1977) 56 A.D.2d 689, 391 N.Y.S.2d 740; *Rolnick v. Rolnick* (2d Dept. 1968) 29 A.D.2d 987, 290 N.Y.S.2d 111, aff'd 24 N.Y.2d 805, 300 N.Y.S.2d 586, 248 N.E.2d 442.