ELECTROGLAS, INC., a California
Corporation, and Xynetics, Inc., a
corporation, Plaintiffs,

v.

DYNATEX CORPORATION, a California
Corporation, and Barrie F. Regan,
Defendants.

No. C 78–1290 CFP.

United States District Court,
N. D. California.

June 5, 1980.

See also, D.C., 473 F.Supp. 1167.

Ralph C. Alldredge, San Francisco, Cal., Conrad F. Gullixson, Palo Alto, Cal., for plaintiffs.

Thomas G. Wood, Severson, Werson, Berke & Melchoir, San Francisco, Cal., for defendants.

POOLE, District Judge.

In this antitrust controversy arising from the sale of a prototype wafer saw and the distributorship of a dicing blade (or "wheel"), defendants have moved for summary judgment on all of plaintiffs' antitrust claims. Following extensive hearings and briefings by the parties, the Court has concluded that the motion should be granted in part for the reasons stated herein.

*FACTS*

Plaintiffs, Xynetics, Inc. (Xynetics) and its wholly–owned subsidiary Electroglas, Inc. (Electroglas) manufacture and distribute semiconductor equipment.

Defendant Dynatex Corporation (Dynatex) is engaged in the same business. Defendant Barrie F. Regan (Regan) is the controlling shareholder of Dynatex.

In December, 1973, defendants developed a diamond impregnated dicing blade which was manufactured by a secret method. Defendants also had at that time a partially developed wafer saw (a cutting instrument used in dicing semiconductor wafers). In early 1974, the parties began negotiations whereby plaintiffs would acquire a distributorship of the dicing blade, and would purchase the prototype wafer saw. On March 19, 1974, two agreements were simultaneously executed reflecting these negotiations. The distributorship agreement provided that plaintiffs would be the exclusive dealers in the dicing blade. The sale agreement provided that Electroglas would purchase the wafer saw from Regan for $2.1

million. Electroglas paid $100,000 at the time of the signing and executed a $2 million note which Xynetics guaranteed.

Late in 1974, plaintiffs asked Regan to subordinate their debt to a line of bank credit which they were seeking. As a condition for doing so, Regan required Electroglas to modify the Distributorship Agreement to provide that the blade distributorship would become non–exclusive if plaintiffs failed to make two consecutive payments for the saw. The amendment was executed December 9, 1974. Thereafter, Electroglas failed to make the minimum purchases required of it under the blade Distributorship Agreement. Defendants then demanded further amendments to the agreement, and these were put into execution on March 9, 1976. One amendment provided that Electroglas could not order dicing blades from any other source so long as Dynatex was able to fulfill all of Electroglas's requirements. Another gave to either party the option to terminate the agreement without cause upon 90 days' notice.

In early 1978, following a merger of plaintiffs with another corporation, their new management reviewed the amended agreements with defendants and suggested that they be renegotiated. Defendants interpreted this as an expression of plaintiffs' dissatisfaction with the distributorship agreement and gave written notice of termination in May, 1978.

On June 12, 1978, plaintiffs filed this antitrust action, seeking treble damages, a declaratory judgment that the prototype saw Sale Agreement and guarantee are void, and an injunction restraining defendants from accelerating the debt due under the saw Sale Agreement and from ceasing performance under the blade Distributorship Agreement. On June, 30, 1978, this Court denied plaintiffs' motion for a preliminary injunction against acceleration of the ·debt. Thereafter plaintiffs missed a $75,000 payment on the saw agreement, and Regan filed a counterclaim for the $750,000

balance due on the note. Dynatex also filed a counterclaim for $153,925.36 owed to it for blades purchased under the distributorship agreement. On December 15, 1978, the Court denied plaintiffs' motion that the counterclaims be dismissed for lack of jurisdiction. On January 18, 1979, plaintiffs filed counterclaims in reply to both the Dynatex counterclaims and the Regan counterclaims. On July 13, 1979, the Court granted Regan's motion for summary judgment on his $750,000 counterclaim and as to plaintiffs' "counterclaims in reply" to Regan's claim, except to the extent the latter pleadings incorporated plaintiffs' antitrust allegations. This decision is reported at 473 F.Supp. 1167.

Defendants now seek summary judgment on all of plaintiffs' antitrust claims and "counterclaims in reply."

### ANTITRUST CLAIMS

Plaintiffs claim that defendants have packaged or tied rights in the Regan prototype saw to the Dynatex dicing blade distributorship, and that such an arrangement constitutes a tie–in which is illegal *per se* under Section 1 et seq. of the Sherman Act, 15 U.S.C. § 1 et seq., and Section 3 of the Clayton Act, 15 U.S.C. § 14. In a second count, they allege that defendants' course of conduct has unreasonably restrained trade in violation of Section 1 of the Sherman Act. Although it is not clear from the complaint, plaintiffs also contend that the March 1976 amendment to the blade Distributorship Agreement constitutes an exclusive dealing contract in violation of Section 3 of the Clayton Act.

### A. *PER SE TYING CLAIMS*

██ Tie–ins involve a seller's refusal to sell one product (the tying product) unless the buyer also purchases another (the tied product). *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Tie–in arrangements are illegal *per se* under both Clayton Act, § 3,[1] and Sherman Act, § 1,[2] if certain

---

1. 15 U.S.C. § 14, provides as follows:

It shall be unlawful for any person engaged in commerce, in the course of such com-

merce, to lease or make a sale or contract for sale of goods, wares, merchandise, machin-

elements exist, and it is not necessary to make a specific showing of any unreasonable anticompetitive effect. *Id.* The necessary elements as derived from Supreme Court opinions have recently been defined by the Ninth Circuit in *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977), as follows:

1. There must in fact be a tying arrangement between two distinct products or services;

2. The defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market;

3. The amount of commerce in the tied product market must not be insubstantial. 550 F.2d at 1212, citing *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) [Fortner I] and *Northern Pacific Ry. Co., supra*, 356 U.S. at 5–6, 78 S.Ct. at 518. Additionally, some modicum of coercion must appear, either specifically or as implied from a showing that an appreciable number of buyers have accepted burdensome terms and that there exists sufficient economic power in the tying product market. *Moore*, 550 F.2d at 1216–17. If the buyer is free to take either product by itself, there is no coercion and no tying problem. *Id.; Northern Pacific Ry. Co., supra*, 356 U.S. at 6, n. 4, 78 S.Ct. at 518.

While defendants have raised numerous affirmative defenses, answers to the following questions dispose of the tying claims. First, does the evidence presented in this record leave plaintiffs with a genuine disputed issue of material fact as to the existence of a coercive or involuntary tie–in between the sale of the saw and the granting of the exclusive blade distributorship? Answer: No. Second, are plaintiffs' damage claims barred by the four–year statute of limitations of Section 4B of the Clayton Act, 15 U.S.C. § 15b? Answer: Yes.

Because these issues are dispositive, it will be unnecessary for the Court to reach defendants' other grounds for summary judgment dealing with foreclosure of competition, interstate commerce, and the evidence of injury to plaintiffs.

### 1. *Existence of a Tie–in.*

As to the first required element, there is no dispute about the two products being distinct, in that the blades may be used in conjunction with saws other than the Regan saw. The dispute is whether the sale of the dicing saw was in fact tied to the distributorship for the dicing blades. Plaintiffs claim that defendants refused to sell them the blades under the Distributorship Agreement unless they also agreed to purchase the prototype dicing saw for $2.1 million under the Sale Agreement.

This is essentially a factual issue as to which defendants have the burden on this motion to demonstrate the absence of any genuine issue of material fact necessary to support summary judgment in their favor. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 438–39 (9th Cir. 1979).

Defendants contend that all admissible evidence leads to the conclusion that plaintiffs voluntarily chose to enter into both the saw sale and the blade distributorship agreements. In support, they offer deposition testimony by Barrie F. Regan, the sole owner of Dynatex who developed the blades

ery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale .. or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

**2.** 15 U.S.C. § 1, provides as follows:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal ....

and saw and negotiated the deals with plaintiffs, and by Conrad Gullixson, Regan's attorney who participated in the negotiations and drafting of the agreements. This testimony denies that Regan ever required Electroglas to buy the saw in order to get the blade distributorship. Defendants also rely on letters of intent and subsequent drafts of agreements prepared by Marc Hayutin, attorney for Electroglas, containing provisions conditioning plaintiffs' willingness to enter into one agreement upon defendants' willingness to enter into the other.

To support an inference that defendants did condition their willingness to sell the blades upon plaintiffs' agreement to purchase the saw, plaintiffs offer deposition testimony of Hayutin and of Burt Cohn, who was Chairman of the Board of Xynetics until February 1974. Cohn says that he expressed his concern about the price of the saw in a conversation with Gerald Lucus who was President of Electroglas during the negotiations with defendants. He stated that Lucus, on this subsequent occasion, told him that he could not get the blades without the saw because Regan would not let them go separately. Hayutin says that he was given the impression by Lucus and probably Cohn that Electroglas had to acquire both the blades and the saw and could not have one without the other. Both Cohn and Hayutin concede that Regan never told them that he insisted on a package deal. Plaintiffs do not contend that Lucus told Cohn and Hayutin about a specific statement made by Regan to Lucus to this effect. Rather, they wish to draw from Lucus' later statements to Cohn an inference to the effect that Electroglas in fact had to buy both items.

■ Plaintiffs argue that Lucus' post–transaction statements should be admissible to show a state of mind or belief on his part that the concessions had been coerced from Electroglas. Defendants reply that Cohn and Hayutin's testimony about Lucus' statements to them raises serious hearsay problems. There is an initial issue of relevance since Lucus' subsequent state of mind or belief is not at issue. Plaintiffs further contend that that belief, indirectly revealed, may be deemed to refer to the antecedent time of the negotiations and to a belief that Lucus then held–such a belief by further inference logically caused by some external influence–and therefore attributable to defendants' coercive conduct. Quite apart from the attenuation of inference upon inference, that rationalization does not serve to remove the statements from the application of the hearsay rule. *Federal Rules of Evidence* provides as follows:

> "Rule 801(c) Hearsay: 'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

By whatever route plaintiffs' theory is taken, they essentially seek to prove that Lucus signed the agreements because he could not get the blades without the saw; and this is based upon the fact that Lucus made that statement to Cohn when Cohn expressed concern about the ·price. Lucus' statements to Cohn and to Hayutin are not admissible to prove the very fact asserted therein, that he "had" to take the package, i. e., that Regan coerced him into doing so. Nor would the statements be admissible as an exception to the rule, because Rule 803(3) provides that:

> "A statement of the declarant's then existing state of mind * * *· [is not excluded by the rule], but not including a statement of memory or belief to prove the fact remembered or believed unless it relates [to testamentary matters]."

This rule has adopted the narrower holding of *Shepard v. U. S.*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) rather than the broader implication of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Professor Saltzburg has commented:

> "The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay

statement, to serve as the basis for an inference of the happening of the event which produced the state of mind. *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933); Maguire, *The Hillmon Case—Thirty—three Years After*, 38 Harv.L.Rev. 709, 719–731 (1925); Hinton, *States of Mind and the Hearsay Rule*, 1 U.Chi.L.Rev. 394, 421–423 (1934). The rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." S. Saltzburg and K. Redden, Federal Rules of Evidence Manual 541 (2d ed. 1977).

Nor, in view of the specific exclusion in Rule 803(3) may Lucus' statements be received for the truth of the assertions contained therein under the "equivalent circumstantial guarantees of trustworthiness" exception of Rule 804(b)(5) despite his unavailability on account of his death in 1978.

In addition to this deposition testimony, plaintiffs point to six items of "circumstantial evidence" to support an inference of tying:

1. Simultaneous execution of the blade distributorship agreement and the saw sale agreement;

2. The December 1974 amendment giving Dynatex the right to terminate the blade distributorship if plaintiffs failed to make two successive payments to Regan for the saw;

3. The allegedly disproportionate price of the saw (plaintiffs say it was worth about $150,000 rather than the $2,100,000 paid for it);

4. A tax memorandum from defendants' accountant which referred to the minimal value of the saw and suggested that a portion of the purchase price might be to assure Electroglas a source of supply of the blades;

5. A series of proposed agreements in draft stage containing tying clauses from either the buyer's or seller's point of view, the latter of which stated that the Distribu-

tion Agreement was not to be effective unless the Sale Agreement was also executed;

6. An agreement reached between attorneys Hayutin and Gullixson to remove the tying clauses after Gullixson considered possible antitrust implications.

Following the hearing on these motions, plaintiffs submitted supplemental deposition testimony from Hayutin, stating that he told Gullixson the clauses were unnecessary since Gullixson's client (defendants) obviously was not going to sign one agreement without the other and that Gullixson did not disagree with this statement. This testimony adds little, if anything, to plaintiffs' case.

After carefully considering all of plaintiffs' evidence and defendants' responses to it, the Court concludes that it is insufficient to support a reasonable inference that defendants refused to sell the blade distributorship unless plaintiffs also bought the saw, or that plaintiffs were "coerced" into buying both as a package. No genuine issue remains for trial on this point.

 The Court also finds that the December 1974 amendment to the Distributorship Agreement does not constitute a tie–in independent of the March 1974 arrangement. The amendment did not involve a sale at all, but rather a change in the credit terms under the preexisting Sale Agreement. Plaintiffs were not required to buy any product they had not already bought. The consideration was not the sale of any tying product by Regan's subordination of his note to plaintiffs' bank line of credit.

 The absence of substantive evidence of a tie–in entitles defendants to judgment as a matter of law on plaintiffs' tying claims. The Supreme Court has cautioned that summary procedures should be used sparingly in complex antitrust litigation. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). There are, however, circumstances which authorize or even require summary disposition, *Sherman v. British Leyland Motors, Ltd.*, *supra*, 601

F.2d at 447, as where plaintiff fails to produce significant probative evidence tending to support the complaint once the movant has met its burden. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1960). This is such a situation.

### 2. *Statute of Limitations.*

Even if the existence of a tie and the other elements of an illegal tying arrangement could be shown, plaintiffs' damage claims would be barred by the antitrust statute of limitations. Section 4B of the Clayton Act provides as follows:

> "Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued."

15 U.S.C. § 15b. Plaintiffs' treble damage claim is an action to enforce a cause of action under 15 U.S.C. § 15, which authorizes such actions by any person injured in his business or property by reason of anything forbidden in the antitrust laws. The key transaction which plaintiffs allege constituted an illegal tie–in occurred on March 19, 1974, more than four years before the action was filed on June 12, 1978.

■ There are two bases for allowing an antitrust suit to be brought more than four years after events which initially created a cause of action: (1) if defendant commits further overt acts or continuing violations which injure plaintiffs' business during the limitations period; and (2) if the damages attributable to defendants' actions outside the limitations period were speculative or unprovable at that time. *In Re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 70–71 (9th Cir. 1979), *cert. denied, AMF Incorporated v. General Motors Corporation*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). Both bases are derived from *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 552 (1971).

■ Plaintiffs here do not attempt to invoke the second exception, that damages were unascertainable at the time the two agreements were executed. Their injury from the alleged illegal tie is readily measurable by the difference between the contract price for the saw and its real value at the time of purchase. See *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

■ Plaintiffs do attempt to invoke the continuing violation exception in several ways. First, they contend that the December 1974 amendment to the Distributorship Agreement was a "damaging amendment" constituting an additional overt illegal act within the limitations period. For reasons stated *supra*, the amendment did not itself constitute an illegal tie–in. Further, it did not cause plaintiffs additional monetary damage beyond that attributable to the original agreements. And the record does not indicate that defendants ever exercised their right to terminate the blade distributorship because of nonpayment for the saw, as allowed by this amendment. The December 1974 amendment thus fails to provide the continuing violation that could create or revive plaintiffs' cause of action as of that time.

■ Second, plaintiffs emphasize the *continuing harm* occurring during the limitations period, e. g., making the installment payments on the Regan note for the saw and thus reducing their capacity to purchase alternative goods. Plaintiffs rely heavily on *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975). This case held that the statute of limitations did not bar an antitrust challenge to an exclusive baseball stadium concession franchise contract even though the claim was not filed within four years of the last allegedly damaging act (an amendment to the contract). The Court said:

> "This argument overlooks the necessarily continuing nature of the alleged harm .... Thus the fact that the final amendment to the contract was made in 1954 does not preclude Finley from bringing suit in 1968. To hold otherwise is to say that some damage that might have

been sustained was barred before it accrued." 512 F.2d at 1270.

It is not clear what the court there meant by "continuing nature of the alleged harm." *Zenith Radio, supra,* and other cases make it clear that a continuation of harm to *plaintiffs* alone will not keep the cause of action alive without some overt act or continuing conduct of *defendants* during the limitations period. In *Zenith,* the Supreme Court said that "each time a plaintiff is injured by an *act* of the defendants a cause of action accrues to him to recover the damages caused by *that act* and that, as to those damages, the statute of limitations runs from the commission of the *act....*" 401 U.S. at 338, 91 S.Ct. at 806 (emphasis added). See also *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968); *In Re Multidistrict Vehicle Air Pollution, supra,* 591 F.2d at 71; *Steiner v. 20th Century Fox Film Corp.,* 232 F.2d 190, 194–95 (9th Cir. 1956); *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 127 (5th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Imperial Point Colonnades Condominium, Inc. v. Mangurian,* 549 F.2d 1029, 1035 (5th Cir. 1977), *cert. denied,* 434 U.S. 589, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977). The following language from *Zenith* also satisfies any concern that plaintiffs' damages might be barred before they accrue:

> "[E]ach separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial." 401 U.S. at 338–39, 91 S.Ct. at 806.

It is reasonable to conclude, therefore, that the continuing harm which concerned the court in *Twin City Sportservice,* and which would be needed to show a continuing antitrust violation sufficient to revive old or create new causes of action, is a continuing *antitrust* harm, i. e., a continuing injury to *competition,* not merely a con-

tinuing pecuniary injury to a plaintiff. The antitrust laws were enacted to protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In *Twin City Sportservice,* competition was potentially injured each season that the parties dealt exclusively with each other on stadium concessions because of the exclusive franchise agreement. In the instant case, any harm to competition occurred and was complete when plaintiffs made the single one–time purchase of the Regan prototype saw, thus foreclosing purchase of any competing prototype saw. The installment payment arrangement was simply a method of financing the purchase which, if anything, softened the impact on plaintiffs' ability to use their resources for the purchase of products other than prototype saws.

Finally, plaintiffs argue that defendants committed continuing violations of the antitrust laws by continuing to enforce the saw sale agreement and to reap the benefits therefrom. Support for this "continuing benefits" theory is found in *Imperial Point Colonnades Condominium, Inc. v. Mangurian, supra,* where the Fifth Circuit held that an action for illegal tying of condominium purchases to 99–year recreational leases was not barred although brought more than four years after the purchases and leases were consummated. The court said that a new cause of action accrued upon each act of collection of rent or increase under an escalator clause. The court embraced the broad view that a cause of action continues to accrue for as long as the defendant takes advantage of an illegal contract. 549 F.2d at 1036.

Notwithstanding *Mangurian*'s comments on *Twin City Sportservice, supra,* 549 F.2d at 1039, no case has been cited in which the Ninth Circuit has expressly adopted this broad proposition. Followed literally, this theory would render the Clayton Act statute of limitations virtually inoperative in all cases involving relatively long–term contracts. The Fifth Circuit itself has since limited *Mangurian.* While it applied the

principle to virtually identical facts in *Spitz v. Buchwald*, 551 F.2d 1051 (5th Cir. 1977), it refused to extend it in *City of El Paso v. Darbyshire Steel Co., Inc.*, 575 F.2d 521 (5th Cir. 1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). That case held that a suit by the city against collusive bidders on a steel supply contract was barred because it was brought more than four years after the contract was executed, even though deliveries and payments continued to be made into the limitations period, because the rights and liabilities of the parties were finalized by the contract which fixed the price, quantity, and delivery schedule. *Mangurian* was distinguished as a case involving damages that were not ascertainable at the time the contracts were executed.

The present case is closer to *Darbyshire Steel* than to *Mangurian*, and closer to *Multidistrict Vehicle Air Pollution, supra*,[3] than to *Twin City Sportservice*. The rights and liabilities of the parties were finalized by the contracts executed in March 1974, which fixed the price and payment schedule for the saw. Acts subsequent to that were "but unabated inertial consequences of some pre–limitations action." *Multidistrict Vehicle Air Pollution, supra*, 591 F.2d at 72. The installment payments were part of a financing arrangement which was incidental to the main transaction, not at the heart of the matter as were the lease rent payments in *Mangurian*. The December 1974 amendment merely modified that financing arrangement, and defendants' collection of installment payments merely implemented it. Defendants committed no antitrust violations during the limitations period. Any antitrust harm to competition occurred when the saw was purchased in March 1974. Any damages to plaintiffs were readily ascertainable at that time, unlike the damages attributable to the adjustable recreational lease payments in *Mangurian* or the variable annual concession receipts in *Twin City Sportservice*.

The conclusion, therefore, is that plaintiffs' cause of action on the tying claims accrued in March 1974, more than four years before the action was brought, and was not revived by any events occurring during the four–year limitations period.

## B. RULE OF REASON TYING CLAIMS

■ Plaintiffs correctly maintain that summary judgment against them on their *per se* tying claims does not necessarily invalidate their tying claims under a rule of reason theory. See *Fortner Enterprises v. U. S. Steel, supra*, 394 U.S. at 500, 89 S.Ct. at 1257 (1969). However, the failure to establish the existence of a tie–in must cause the tying claims to fail under either theory. Without this key element, the extent of any effect on competition and the reasonableness of any restraint of trade are irrelevant. Moreover, the statute of limitations bars the damage claims under either theory.

## C. EXCLUSIVE DEALING CLAIM

■ The March 1976 amendment to the Distributorship Agreement provided that "so long as the exclusivity of the Distributorship Agreement is continued and as long as Dynatex is able to fulfill all dicing wheel requirements of Electroglas, it will not order dicing wheels from any other source." Plaintiffs maintain that this clause is an illegal exclusive dealing agreement in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

The parties have given scant attention on this motion to this claim, which requires a complex analysis under the rule of reason. See 16 H. Von Kalinowsky, *Antitrust Laws and Trade Regulation*, §§ 64.01 *et seq.* (1979). Defendants' argument that plaintiffs could not possibly show injury from this clause is without merit. Defendants have failed on this issue to meet their bur-

---

**3.** The Ninth Circuit there held that an action by a manufacturer of a pollution control device against automobile manufacturers who agreed not to purchase the device was barred because the decisions not to purchase it were final before the four–year limitations period. 591 F.2d at 72.

den of demonstrating the absence of any genuine issue of material fact for trial or entitlement to judgment as a matter of law.

Unlike the tying claims, this claim arose less than four years before the suit was filed and is not barred by the limitations period in 15 U.S.C. § 15b.

*OTHER CLAIMS*

Defendants' present motion does not encompass the Dynatex counterclaim for amounts due under the blade Distributorship Agreement or plaintiffs' "counterclaims in reply" to that counterclaim. These are essentially contract and other common law claims, rather than federal antitrust claims. This Order, therefore, makes no disposition as to such claims.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment be, and the same hereby is, granted on all of plaintiffs' antitrust claims to the extent they are founded upon an alleged illegal tying arrangement.

IT IS FURTHER ORDERED that the motion is denied as to all other remaining claims and counterclaims.